UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DREAM'N PROMOTIONS, LLC,

    Plaintiff,

vs.

WOODWARD DREAM CRUISE, INC.,

    Defendant.
_____/

Civil Action No.
09-CV-10967

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## **OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

### I. INTRODUCTION

Plaintiff's complaint against Defendant charges two counts: breach of contract and promissory estoppel. Plaintiff, Dream'n Promotions, LLC ("Dream'n"), entered into a written contract with Defendant, Woodward Dream Cruise, Inc. ("WDC"), whereby Dream'n would create, produce, and sell an official Woodward Dream Cruise[1] program. The agreement between the parties

---

[1] As stated on Wikipedia,

> [t]he Woodward Dream Cruise is a classic car event held annually on the third Saturday of August. The WDC Event spans much of Woodward Avenue from Pontiac through Ferndale in Oakland County, Michigan, all the way to the State Fair Grounds inside the Detroit city limits, just south of 8 Mile Road.
>
> Today, the Woodward Dream Cruise is the world's largest one-day automotive event, drawing 1.5 million people and 40,000 classic cars each year from around the globe.

Wikipedia, Woodward Dream Cruise, at http://en.wikipedia.org/wiki/Woodward_Dream_Cruise (last visited April 9, 2010).

prohibited WDC from giving any publication, other than Dream'n, "the right to use" the official Woodward Dream Cruise logo. Dream'n contends that WDC breached the contract when an individual associated with WDC e-mailed the official Woodward Dream Cruise logo to the owner of Cruis'news ("CN" or "Cruis'news"), a competitor of Dream'n, which displayed the logo on the cover of, and throughout, its own publication during the Dream Cruise.

Now before the Court is WDC's Motion for Summary Judgment. This matter has been fully briefed and the Court heard oral argument on April 7, 2010. For the reasons that follow, taking the evidence in the light most favorable to the non-moving party, WDC's motion will be denied as to Dream'n's breach of contract claim, and granted as to Dream'n's promissory estoppel claim.

## II. BACKGROUND

### A.

On March 31, 2008, Dream'n and WDC entered into a written agreement whereby Dream'n would create, produce, and sell an official Woodward Dream Cruise program to promote sponsorship of, and commemorate, the event. The contract was signed by Jim Thomas, the owner of Dream'n, Dale Dawkins, the President of WDC, and Dan Tanner, the Executive Director of WDC. In addition to being the Executive Director of WDC, Tanner was also the co-owner of a media agency: Tanner Friedman. Tanner Dep. at 13. At all times relevant to this action, Tanner Friedman had a contract with WDC to perform media services for WDC. Tanner Dep. at 22.

WDC is a non-profit organization that runs and oversees the Woodward Dream Cruise. Tanner Dep. at 19; WDC Br. at p. 1 n.1. At all times relevant to this action, WDC's office was located within the offices of Tanner Friedman and certain Tanner Friedman employees, including Justin Fisette, worked on the Woodward Dream Cruise project. Tanner Dep. at 103-104.

The contract between Dream'n and WDC included the following significant provision:

2

> WDC shall not enter into any other agreement or with any other publisher for the rights to The Woodward Dream Cruise Program. No other publication shall have the right to use The Official Woodward Dream Cruise Program designation.

WDC Ex. C.[2] The parties agree that the term "designation," as it is used in the preceding sentence, is a reference to the official Woodward Dream Cruise logo. This logo is displayed at the top of the first page in WDC's Exhibit F.

## B.

---

[2] Other provisions contained in the parties' contract include the following:

- Dream'n . . . will produce a minimum 80 page program which will be used as a vehicle for enhancing sponsorships for the [Woodward Dream Cruise] and a commemorative of the [Woodward Dream Cruise].

- Dream'n . . . publications has the sole, official and exclusive rights and privileges to sell advertising in the official program and collect money for the sale of advertising and single and bulk copy sales before, during and after each event for each of the three years named, with the first rights of refusal on subsequent years.

- The expense for producing the magazine and selling and distributing the magazine will be the sole responsibility of Dream'n . . . . The publisher agrees to a minimum of 100,000 copies per year, and has the rights to increase copies and circulation at the discretion of the publisher.

- Dream'n . . . agrees to provide free of charge up to 500 copies of the Official [Woodward Dream Cruise] Program.

- Dream'n . . . agrees to . . . [p]ay [WDC] a fee of $10,000 each year for three years, payable by April 1 of the year.

- Dream'n . . . agree to [pay WDC] .25 cents for each [copy] sold in 2008, .275 cents per copy in 2009 and .30 cents [in] 2010 . . .

WDC Ex. C.

3

At the beginning of the 2008 Woodward Dream Cruise event week, on or about August 11, 2008, during a visit to WDC's office, located in Tanner Friedman's offices, Dream'n's owner Thomas noticed a copy of CN's August 2008 Dream Cruise publication displaying the official Woodward Dream Cruise logo on the cover. Thomas Dep. at 42; WDC Ex. E. As described by Thomas at his deposition:

> When I walked into Tanner's office that day and that morning, I – before going into the conference room, I happened to walk by a desk where a woman, Sara Bloomberg, was sitting. On that desk were several copies of a publication called Cruis'news.
>
> I immediately took a look at this magazine, this program, Cruis'news, and said what's this, to which Ms. Bloomberg replied oh, this is Cruis'news. It's a program or a magazine – program, I believe she said, for the Woodward Dream Cruise and I've been working on it with them and helping them out with stories and content.
>
> So I picked up a copy of the Cruis'news from her desk and walked down to Mr. Tanner's office and said what's this, to which he looked at it and said oh, that's Cruis'news. And I said well, it says here that it's – that they're an official sponsor of the Woodward Dream Cruise and this is a program.

Thomas Dep. at 42. Tanner testified that when Thomas confronted him, he was "surprised" to learn that CN had used the official Woodward Dream Cruise logo in its publication:

> I saw [the logo] on the cover [of CN's publication] and . . . I'm sure at the time was surprised. I'm sure I also made a mental note – in fact, I know I made a mental note and mentioned it later to [legal counsel] to look into. I try to watch for various uses of our logo or – I say our – their logo or name and bring it to the attention of legal counsel to look into, but that would have been the extent to – of it at that time.

Tanner Dep. at 111.

## C.

WDC had sold a business sponsorship to CN, just as it had done with hundreds of other businesses who wished to be listed as an official sponsor of the Woodward Dream Cruise. Business

4

sponsorships sold for $550 and entitled the sponsor to the following benefits:

- The sponsor's company logo is put on the Woodward Dream Cruise website (www.WoodwardDreamCruise.com) with a hyperlink back to the sponsor's company website.

- A 1.5" x. 1.5" ad on the "Official Woodward Dream Cruise Map."

- A 3" x 1.25" ad in the "Woodward Dream Cruise Newspaper Special Section."

- A business plaque with the sponsor's company name on it.

*See* WDC Ex. F. Importantly, the parties agree that a business sponsorship does not authorize the sponsor to use the official Woodward Dream Cruise logo. *See* Thomas Dep. at 82-83 (agreeing that "[t]here's nothing in the business sponsorship that authorizes anyone who buys [a business] sponsorship to use the Official Dream Cruise logo"). Thomas admitted at his deposition that "[t]here's nothing in [his contract with WDC] that says [WDC] can't sell a business sponsorship." *Id.* at 81. Based on this testimony, it is clear that WDC did not violate its contract with Dream'n by merely selling a business sponsorship to CN.

**D.**

The owner of CN, Dana DeCoster, admitted that the business sponsorship agreement did not authorize him to use the official Woodward Dream Cruise logo and that CN had "no written documentation whatsoever from an authorized representative of [WDC] authorizing [his company] to use the official logo for any purpose." DeCoster Dep. at 82-83.

DeCoster testified that he received the official Woodward Dream Cruise logo as follows. DeCoster telephoned Justin Fisette, an employee of Tanner Friedman assigned to work on the Woodward Dream Cruise project,[3] and asked him for an electronic high resolution copy of the

---

[3] In its brief in support of summary judgment, at page 4, WDC states that Fisette was a "representative of the WDC." In its reply brief, however, WDC states, at page 2, that Fisette

5

official Woodward Dream Cruise logo. *Id*. at 83. Fisette e-mailed DeCoster a high-resolution electronic copy of the logo. Fisette's e-mail did not include an authorization to use the logo, or any restriction on its use. *Id*. at 83-84. DeCoster testified:

> Q: And as I understand your testimony, at some point you called Justin Fisette and said, "Can you send me a high-resolution copy of the official logo, correct?
>
> A: Correct.
>
> Q: And it's your testimony that he sent that to you electronically, via e-mail?
>
> A: Correct.
>
> \* \* \* \*
>
> Q: Would I be correct that Mr. Fisette did not provide you with any written authorization or verbal authorization to use that logo for any purpose?
>
> A: Correct.
>
> Q: [A]fter that logo was sent to you, you said you decided to use the logo, correct?
>
> A: Correct.
>
> Q: And that was a decision you made?
>
> A: It was based on previous years.
>
> Q: Based on previous years, but without any written or verbal authorization from anyone from The Woodward Dream Cruise, Inc.?
>
> A: Correct.

---

"was not an employee of WDC." At oral argument, Defendant's counsel stated that Fisette was not a representative of WDC and that its statement on page 4 was an "error." In any case, the Court finds Fisette's actions attributable to WDC because Fisette was an employee of Don Tanner, who was also the Executive Director of WDC, and had designated Fisette to work on the WDC account.

*Id*. at 83-84.

### E.

DeCoster sold the August 2008 edition of CN at a price of $5, although the cover price was $6. *Id*. at 62. DeCoster testified that none of his employees gave the magazine away for free except that approximately 110 issues were given away free-of-charge at a press event/breakfast. *Id*. at 78-79. Thomas, on the other hand, testified that he "went to a filling station in Royal Oak and got [CN] for free." Thomas Dep. at 65.

### F.

The cover price on the official Woodward Dream Cruise program published by Dream'n was $5. *See* Compl. at Ex. C. However, "they were not all sold for $5." Thomas Dep. at 63. Thomas testified that he was forced to sell them for less than $5, or give them away free-of-charge, "due to the fact that Cruis'news was giving them away for free and subverting [Thomas'] sales." *Id*. at 64. As explained by Thomas,

> Q: What [price] did you tell them [Thomas' employees] to sell them for?
>
> A: I told them to sell them – in the beginning, we reduced them to – at one point, the first reduction was I think $3, and then toward midday we went to I believe it was $2.
>
> Q: Any further reduction?
>
> A: Then it was, you know, you could sell them for a dollar or start handing them out.

*Id*.

### G.

In an affidavit, which is attached as Exhibit 2 to Dream'n's response brief, Thomas testified as follows:

> I discussed with Don Tanner that it was critical that my company be the exclusive publication licensee of the new Official Logo. Don Tanner assured me that no other publication would use the Official Logo. Thus, in reliance on those statements, as well as other statements, information and market research studies he provided to me . . . I agreed to the contract . . .

Thomas Aff. at ¶ 6. Thomas further stated that he "never would have signed the Agreement if [he] had believed that any other publication whatsoever would be using the 2008 Woodward Dream Cruise Official Logo . . . . [H]e simply had to [sic] much at stake to not have such exclusivity." *Id*. at ¶ 7.

## H.

Dream'n filed the present lawsuit on March 16, 2009. As noted above, the parties' contract states that "[n]o other publication shall have the right to use The Official Woodward Dream Cruise Program designation." Dream'n alleges that WDC breached this provision when Fisette e-mailed an electronic high resolution version of the official Woodward Dream Cruise logo to DeCoster, who then displayed the official logo throughout his August 2008 publication. According to Dream'n, "WDC willingly and freely gave the Official Logo to CN for its use without any restraint, restriction or question as to its intended use." Dream'n contends that it was financially harmed by WDC's actions in this regard because it no longer had exclusive use of the official Woodward Dream Cruise logo, as it had bargained for, and, consequently, consumers who would have otherwise bought Dream'n's publication, instead bought or received free-of-charge CN's publication.[4]

Dream'n seeks damages as follows: (1) lost profits in excess of $950,000 ($250,000 in 2008,

---

[4] In its Complaint, Dream'n contends that WDC breached the contract when it sold a business sponsorship to CN. *See* Compl. at ¶¶ 17, 27-28. In its motion papers, however, Dream'n changes its theory inasmuch as it essentially concedes that WDC did not breach the contract by selling a business sponsorship to CN, but instead argues that WDC breached the contract when Fisette e-mailed the logo to DeCoster.

8

$350,000 in 2009, and $350,000 in 2010),[5] (2) an amount in excess of $79,000 for expenses and costs incurred in producing and advertising its program, and (3) $6,950 for advertising and sponsorships received by WDC without charge.

### III. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Conversely,

---

[5] As stated by Dream'n in its Complaint, it "only sold 10,000 copies of the Official Program and gave another 10,000 away for free as a matter of good will in light of the free publication by Cruis'news." Compl. at ¶ 18.

9

where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-323. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

## IV. ANALYSIS

Dream'n's Complaint contains two counts: breach of contract and promissory estoppel. WDC argues that it is entitled to summary judgment with respect to both counts. The Court addresses each count, in turn.

### A. Breach of Contract

#### 1. Law

In order to recover for breach of contract under Michigan law, a plaintiff must establish the following elements: (1) the existence of a contract, (2) the terms of the contract, (3) a breach of the contract, and (4) that the breach caused the injury. *See Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999) (interpreting Michigan law).

The Sixth Circuit has summarized the rules of contract construction under Michigan law as follows:

> A court's primary responsibility in construing a Michigan contract is to ascertain and enforce the intent of the parties. The court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their "ordinary and natural meaning." *See also Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997) (explaining that Michigan contracts are construed as a whole, and that courts should not eliminate any part or word "unless absolutely necessary"). When the written agreement refers to a separate document for additional contract terms, the court must read the writings together. Moreover, whether the parties included the terms in a separate incorporated document or within the agreement itself, the court must strive to harmonize apparently conflicting terms or clauses. If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing.
>
> * * * *
>
> Michigan permits the use of extrinsic evidence to dispose of a potential ambiguity, to prove the existence of a potential ambiguity, or to indicate the actual intent of the parties where an actual ambiguity exists. Whether an ambiguity exists in a written contract is a question of law for the Court's resolution. A contract or term is ambiguous if it is reasonably susceptible to more than one meaning. At the same time, a "court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning."

*Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092, 1095-1096 (6th Cir. 2001) (interpreting Michigan law) (footnote and certain citations omitted).

### 2. The Parties' Arguments

WDC asserts three arguments in support of its position that it is entitled to summary judgment on Dream'n's breach of contract claim. First, WDC contends that it did not breach its

contract with Dream'n by providing the high resolution electronic version of the logo to CN. This argument attacks element (3) of the *Webster* framework.

Second, WDC argues that even if it did breach the contract, the breach did not cause the damages claimed by Dream'n. This argument attacks element (4) of the *Webster* framework.

Finally, in its reply brief, WDC argues for the first time that it cannot be held liable for the actions of Fisette. The Court finds this argument unpersuasive for the reasons previously discussed.

With respect to its first argument, WDC argues that it did not breach the contract when it sold a business sponsorship to CN, as Dream'n alleges in its Complaint. Dream'n essentially (though not explicitly) concedes this in its response brief, as Dream'n's principal argument is that WDC breached the agreement when Fisette e-mailed the high resolution logo to DeCoster – not when WDC merely sold the business sponsorship to CN.

WDC also argues that it did not breach the contract because the contract only prohibits WDC from giving another publication the "right" to use the logo and DeCoster testified that "Fisette did not provide [him] with any written authorization or verbal authorization to use that logo for any purpose." DeCoster Dep. at 83. As stated by WDC in its brief, "WDC was only obligated under the terms of the Agreement to refrain from entering into agreements with other publishers for the rights to the official WDC program" and "cannot, and has no obligation to, control the actions of some third party (e.g., Cruise)." Thus, WDC states that it is not a proper defendant and that Dream'n should pursue a claim against CN instead.

In response, Dream'n emphasizes that the Court must enforce the intent of the parties, which, in this case, it argues is "crystal clear." As stated by Dream'n,

> [t]he Agreement granted Dream'n Promotions the exclusive right to produce The Official Woodward Dream Cruise Program, and "no other publication shall have the right to use the Official Woodward Dream Cruise Program

12

> (WDC) designation." No argument exists between the parties that another publication, Cruis'News, did use the Official Logo in their publication on at least seven (7) pages, including its cover. Moreover, it is undeniable that the Official Logo was provided to Cruis'News by an employee/associate of WDC.

(Emphasis deleted). Dream'n argues that "[p]roviding [CN] a copy of the WDC Official Logo and designation, and allowing it to be used by any other publication is a breach of the contract by the WDC."

WDC's second argument is that even if it breached the contract, the breach did not cause the damages claimed by Dream'n. Dream'n responds that its sales suffered because consumers instead bought or received free CN's program, which improperly utilized the official Woodward Dream Cruise logo to which Dream'n had the exclusive rights. WDC argues that

> [CN] had no impact on Plaintiff's ability to sell programs. Mr. DeCoster testified that he only sold 1,000 copies of Cruis'news during the 2008 Woodward Dream Cruise. No issues of Cruis'news were given away for free during the actual event (only about 60 were given away free of charge at the event's press conference). Furthermore, while DeCoster/Cruise published 18,000 copies of Cruis'news in August, 2008, 8,000 of these copies were sent to subscribers. The bulk of the other 10,000 copies were distributed after the 2008 Woodward Dream Cruise was concluded.

(Emphasis deleted; citations to the record omitted).

In response, Dream'n argues that

> Defendant's position that there is no causal connection between its breach and Plaintiff's damages is without merit. The reason that Jim Thomas was so adamant that Dream'n Promotions be the only publication, and the only publication to use the Official Logo, is that such exclusivity was vital to his success in the promotion and sale of the Official Woodward Dream Cruise Program. Plaintiff would never have agreed to the Agreement with the WDC if it had known of Cruis'news existence, as well as its close relationship with the WDC.

(Citation to the record omitted).

### 3. Discussion

It is undisputed that WDC did not breach the contract by merely selling a business sponsorship to CN. A business sponsorship does not give the sponsor any right—express or implied—to use the official Woodward Dream Cruise logo. Thomas admitted as much during his deposition when he conceded that "[t]here's nothing in the business sponsorship that authorizes anyone who buys [a business] sponsorship to use the Official Dream Cruise logo." Thomas Dep. at 82-83. Thus, to the extent that Dream'n still wishes to advance the argument that WDC breached the contract by selling a business sponsorship to CN, the argument is foreclosed by the evidence; namely, Thomas' own testimony.

The critical question is whether WDC breached the contract when Fisette e-mailed the high resolution official logo to DeCoster, at DeCoster's request, while not warning CN that another publication held the exclusive rights to use the logo. The applicable contract language states:

> WDC shall not enter into any other agreement or with any other publisher for the rights to The Woodward Dream Cruise Program. No other publication shall have the right to use The Official Woodward Dream Cruise Program designation.

WDC Ex. C. There can be no reasonable dispute that WDC did not violate the first of the two sentences when Fisette e-mailed the logo to DeCoster because, by doing so, WDC did not "enter into any agreement . . . with any other publisher for the rights to The Woodward Dream Cruise Program." However, the second sentence prohibits WDC from giving another publication "the right to use" the logo. A jury could reasonably conclude that WDC implicitly gave CN a "right to use the logo" when Fisette sent a high resolution version of the logo to DeCoster, well known as the publisher of CN, with no use limitation. Taking the evidence in the light most favorable to the non-moving party, WDC provided another publication with the ability to use the Official Woodward Dream Cruise Program logo in violation of its contract with Dream'n.

WDC argues that it "cannot, and has no obligation to, control the actions of some third party (e.g., Cruise)." This is true. WDC could not be held liable for breach of the present contract had it only *failed* to act in some way (i.e., by failing to police CN's use of the logo). But again, taking the facts in the light most favorable to Dream'n, this is not a case involving a failure to act. This case involves an overt action – e-mailing a high resolution version of the logo from WDC's office to another magazine publication per the request of that publication. The event triggering liability for breach of the contract is the e-mailing of the high resolution logo.

The Court turns now to WDC's second argument – that any breach of the present contract did not cause the damages claimed by Dream'n. Damages is for a subsequent determination after a verdict. Thomas testified that he "never would have signed the Agreement if [he] had believed that any other publication whatsoever would be using the 2008 Woodward Dream Cruise Official Logo" because "he simply had to [sic] much at stake to not have such exclusivity." Thomas Aff. at ¶ 7. Moreover, Thomas testified that his salespeople

> walked off [the job] . . . because they were encountering people from Cruis'news giving the magazine away for free, walking up behind them while they were trying to sell a magazine, saying don't buy that magazine. Don't buy that because I've got one here that's just like it and for free and, you know, basically encountering resistance because of a free publication that was being given out.

Thomas Dep. at 79-80. DeCoster, on the other hand, testified that CN was given away for free only at a press event/breakfast and not at the actual Woodward Dream Cruise event. DeCoster Dep. at 78-79. In light of this conflicting testimony, the factfinder will determine whether any breach of the present contract caused the damages claimed by Dream'n.

### B. Promissory Estoppel

As stated by another court in this district,

> [i]f the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract. In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract. This is because promissory estoppel is an alternative theory of recovery where no contract exists; and, thus, it is a substitute for consideration.

*Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993) (interpreting Michigan law) (citations omitted). Here, there is no dispute that a contract exists. Rather, the parties dispute its effect. For this reason, Dream'n's promissory estoppel claim is not viable and WDC is entitled to summary judgment in its favor with respect to Count II.

### V. CONCLUSION AND ORDER

For the reasons stated above, WDC's Motion for Summary Judgment [docket entry 15] is granted in part and denied in part as follows: denied as to Dream'n's breach of contract claim; granted as to Dream'n's promissory estoppel claim.

SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: April 9, 2010

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 9, 2010.

s/Denise Goodine
Case Manager